Carlos ROMERO–BARCELO, Etc., et al.,
Plaintiffs-Appellants,

v.

Harold BROWN, et al.,
Defendants-Appellees.

No. 79–1626.

United States Court of Appeals,
First Circuit.

Argued Sept. 11, 1980.

Decided Jan. 26, 1981.

836

Timothy L. Harker and John A. Hodges, Washington, D. C., with whom Peabody, Rivlin, Lambert & Meyers, Lewis A. Rivlin, Washington, D. C., Miguel Gimenez Munoz, Secretary of Justice, Government of Puerto Rico, Thomas R. Lincoln, Dept. of Justice, San Juan, P. R., Gerardo A. Carlo, Sp. Counsel to the Governor of Puerto Rico, Old San Juan, P. R., Jorge L. Cordova, San Juan, P. R., Lawrence White, and Jeffrey N. Martin, Washington, D. C., were on brief, for appellants.

Anne S. Almy, Atty., Dept. of Justice, Washington, D. C., with whom Capt. Thom-

as E. Flynn, Lt. Cmdr. Eugene M. Pinkelmann, Jr., Office of the Judge Advocate Gen., Dept. of the Navy, Washington, D. C., Richard M. Cornelius, Asst. Gen. Counsel, Dept. of the Navy, Washington, D. C., Sanford Sagalkin, Acting Asst. Atty. Gen., Peter R. Steenland, Jr., Dorothy R. Burakreis, and Edward J. Shawaker, Attys., Dept. of Justice, Washington, D. C., were on brief, for appellees.

Before COFFIN, Chief Judge, CAMPBELL and BOWNES, Circuit Judges.

BOWNES, Circuit Judge.

The Commonwealth of Puerto Rico appeals from the district court's denial of its request for a comprehensive injunction against the United States Navy's military training operations on the Island of Vieques, a municipality of the Commonwealth. Armed with a battery of federal and state laws, Puerto Rico[1] alleged that the Navy's[2] activities in and around Vieques cause irreparable injury to the island's ecology and its inhabitants. More specifically, Puerto Rico claimed that the Navy's operations pollute the island's air and its coastal waters, threaten the habitats of endangered species and many of the island's irreplaceable historical sites, and diminish the productivity of the island's fishing and agricultural resources. The Commonwealth also claimed that the Navy transferred certain training activities from the island of Culebra to Vieques, contrary to congressional and executive directives. After an extensive trial, the district court ordered the Navy to obtain a NPDES permit, prepare an environmental impact statement and obtain a determination on the eligibility of certain historical and prehistorical sites on the island for inclusion in the National Register of Historic Places. The court otherwise ruled in the Navy's favor and refused to enjoin the training operations. *Barcelo v. Brown*, 478 F.Supp. 646 (D.P.R.1979). Before turning to the issues raised by Puerto Rico on appeal, we briefly sketch some basic characteristics of the island and the Navy's activities.

*Vieques*

The island of Vieques lies six miles off the southeastern coast of Puerto Rico and approximately nine miles directly south of the island of Culebra. Situated on an east-west axis, Vieques is nearly twenty miles long with an average width of four miles. Of a total area of approximately 33,000 acres, the Navy owns 25,231.72 acres, or slightly more than 76% of the island.

Certain features of the island's ecology deserve particular mention. Fringe and offshore coral reefs are found in the coastal waters of Vieques, primarily off the northern, eastern and southern shores. Seagrass flourishes along the ocean floor adjacent to the coasts; the largest concentration runs from Punta Caballo on the north coast eastward around Punta Arenas to the southwest coast. There are also several large mangrove stands located along the shores; in the west near Punta Arenas and in the south around Puerto Mosquito, Puerto Ferro and Ensenada Honda. Three of the seven bioluminescent bays known to exist in the world are located along the southern coast—Puerto Mosquito, Puerto Ferro, and Bahia Tapon.

Of the animal species living on Vieques, six are designated by the U. S. Fish and Wildlife Service as either "endangered" or "threatened." 50 C.F.R. § 17.11. The "endangered" are the manatees, the brown pelicans, the leatherback turtles and the hawksbill turtles. Considered "threatened" are the green turtles and the loggerhead turtles. At least some of the nesting sites favored by the pelicans and the turtles are

---

1. Appellants—Governor Carlos Romero-Barcelo on behalf of the Commonwealth of Puerto Rico; Radames Tirado-Guevara, Mayor of Vieques; and the Board on Environmental Quality—are hereinafter collectively referred to either as Puerto Rico or the Commonwealth.

2. Appellees—Harold Brown, Secretary of Defense; W. Graham Claytor, Jr., Secretary of the Navy; James L. Holloway, Chief of Naval Operations; I. C. Kidd, Jr., commander in Chief of the Atlantic Fleet; and Louis H. Wilson, Commandant of the Marine Corps—are hereinafter collectively referred to as the Navy.

located within the areas where the Navy conducts its training operations.

The human history of the island dates back at least to the ninth century A.D.[3] At that time, Vieques served as a transit stop in the migration of Arawak Indians from the Orinoco Basin in South America (Venezuela) to Puerto Rico and Hispaniola (Haiti and the Dominican Republic). At the time of Columbus' "discovery" of Vieques in 1493, the island was used by the Carib Indians as a temporary base from which they carried out raids against the people of Puerto Rico. Spain's movement into the Caribbean during the sixteenth century resulted in the first permanent habitation of Vieques by Indians who sought to escape the Spanish occupation of Puerto Rico and St. Croix. Although Spain apparently never attempted to colonize Vieques, it periodically sent military expeditions to the island throughout the seventeenth and eighteenth centuries to maintain its hegemony over the island.

The early years of the nineteenth century mark the beginning of Vieques' modern history. In 1816 colonists from St. Croix and St. Thomas established the first livestock ranches, thus beginning what is today the island's primary agricultural activity. Soon thereafter, one of the colonists organized the construction of a fort at Isabel Segunda. In addition to ranching, the economy of Vieques at this time involved timber harvesting for export to the Virgin Islands, subsistence farming and fishing. By the second half of the century, sugar cane had become the leading cash crop.

After the Spanish American War of 1898, Vieques, together with the rest of Puerto Rico, became a Territory of the United States. The island's economy continued to be dominated through the early 1940's by sugar cane cultivation, ranching, and fishing. Since the mid 1940's, however, the sugar cane industry has declined to a point where it is of no current importance to the island. Thus, the islanders now derive their livelihood from the same sources relied upon by their ancestors more than one hundred fifty years ago—fishing, subsistence farming and ranching.

During the early 1940's the Navy acquired title to most of its present holdings on Vieques. As a result of these acquisitions, civilians now occupy an area of about 7,000 acres, bounded on both the east and the west by Navy property.[4] The present population distribution reflects the island's economy. Of a total population of approximately 8,000, close to 5,000 people live in a rural environment outside the two coastal towns. Located on the northern coast of the civilian sector is the capital, Isabel Segunda, which has between 2,400 and 2,500 inhabitants. Esperanza, the island's other town, located on the southern coast, has a population of approximately 600.

*Navy Operations on Vieques*

The Naval Ammunition Facility (NAF) encompasses the entire area of Vieques west of the civilian zone. The Navy uses the facility for deep storage of conventional ammunition. Ships delivering the ordnance[5] dock at Mosquito Pier, located on the northern coast of the NAF. From there, it is transported by truck to bunkers distributed throughout the NAF. Most of the ammunition is destined for off-island use by the Navy, the Marines and the Puerto Rican National Guard. Occasionally, ammunition is transferred overland from the NAF to the ground maneuver area located east of the civilian zone.

The Navy's installations on the eastern half of Vieques are part of a large military complex known as the Atlantic Fleet Weapons Training Facility, headquartered at

3. Inconclusive archeological evidence suggests the presence of a preceramic Indian culture as early as the second century A.D.

4. At the time of trial, the Navy also owned a small parcel within the civilian sector. It has since been conveyed to the Commonwealth of Puerto Rico.

5. Both the parties and the district court refer to "ammunition" and "ordnance" interchangeably. Although we accept this usage for purposes of this case, it is our understanding that "ordnance" includes weapons as well as ammunition.

Roosevelt Roads Naval Station in Ceiba, Puerto Rico. The facility consists of four firing ranges of which only two are related to Vieques. The outer range, a large area of ocean, at its closest points to Vieques lies thirty-five miles to the north and twenty miles to the south. Within this range, the Navy conducts exercises in ship to ship weapons fire, ship to air missile fire and air to air weapons fire. The underwater range, located off the western shore of St. Croix, involves training in three dimensional tracking of surface and underwater objects. The electronic warfare range is a network of "threat platform" simulators located in Puerto Rico and nearby islands. These are used to train shipboard and airborne electronic warfare teams and provide tactical electronic order of battle support for operations conducted on the other ranges. One simulator is positioned at the western end of Vieques atop Monte Pirata. Until recently, the inner range consisted of air to ground bomb and missile targets and naval gunfire support targets on Culebra, and air to ground, artillery and naval gunfire support targets on Vieques. In 1975, however, the Navy ceased its Culebra operations. Thus, the Vieques installations now comprise the entire inner range.

The inner range is divided into four distinct areas. The ground maneuver area (GMA) extends from the civilian sector eastward for approximately seven miles to a cattle fence which runs the width of the island. Located at the southwestern corner of the GMA is Camp Garcia, a Marine Corps camp which, although able to accommodate several thousand troops, is occupied by one marine. The principal use of the GMA is for Marine amphibious landings. These are conducted throughout the year, primarily on the southern beaches between Punta Conejo and Punta Negra. A typical landing will require the use of large attack transports from which are launched the landing craft and amphibious tracked vehicles. These smaller craft carry troops, tanks and other equipment to the beaches. Once landed, the troops perform maneuvers throughout the GMA, which at times include artillery fire. Upon completion of the land exercise the troops embark from the beaches and return to the attack transports. An amphibious landing usually is accompanied by low-level support flights by fixed wing jet aircraft and helicopter gunships. An amphibious exercise may involve anywhere from two to twenty thousand troops; it may be independent of other inner range operations, or it may be part of a single large-scale maneuver in concert with the Navy's sea and air forces.

The surface impact area (SIA) begins about one mile east of the cattle fence and extends approximately two and one-half miles east to a "firebreak" designated as the western friendly front line. Artillery training, strafing and air to ground bombing, the latter two using inert ammunition only, occur within this area. The artillery is positioned near the western border of the SIA—about six miles from the nearest point in the civilian zone—loaded with live ammunition and fired at targets located in the eastern part of the SIA. Air to ground bombing is directed at two bullseye targets. Target # 2 is situated about one-half mile east of the SIA's western boundary; target # 1 is on a point along the northern half of the western friendly front line. The strafing targets are located at the southern most point of the firebreak.

The Air Impact Area (AIA), also known as the Close Air Support Zone (CAS), runs from the western friendly front line eastward for about two miles to the eastern friendly front line. This area, in which live ammunition is used, contains as targets mockups of two surface to air missile sites, an airstrip, a fuel farm and an ammunition dump. There are also two remote controlled moving targets inland and six naval gunfire support targets along the southern coast of the AIA. No targets exist in the area between the eastern friendly front line and Punta Este, the easternmost point of Vieques. An infrequently used water target lies about one mile east of this point.

Air and sea operations in the inner range occur about 200 days out of a year, usually between 7:30 a. m. and 10:00 p. m. Operations are directed by observers positioned in

an observation post on Cerro Matias, located in the southeastern part of the SIA. Aircraft taking off from the Roosevelt Roads airfield or a carrier located north of Vieques first fly north of Vieques and then circle around the eastern coast to approach the range from the south. Aircraft taking off from carriers located south of Vieques use a straight approach from that direction. Any aircraft carrying ammunition, whether live or inert, is prohibited from flying over the civilian area. As best as can be estimated, an aircraft training in the range would ordinarily come no closer than within five and three-quarters miles of the civilian zone.

Ship to shore gunnery directed at the naval gunfire support targets in the AIA is also restricted to a southern approach. When firing, the ships are usually positioned between three and eleven miles off the southern shore of the AIA. All ship to shore firing occurs within a designated danger zone, which permits the Navy to prohibit all civilian navigation while the area is in use.

*The Issues on Appeal*

Puerto Rico challenges the district court's rulings on the following issues: [6]

1. Did the Navy "transfer" training activities from Culebra to Vieques in violation of certain Military Construction Authorization Acts?

2. Does the dropping of ordnance into the coastal waters of Vieques violate the Puerto Rico Water Quality Standards, contrary to the requirements of § 313 of the Federal Water Pollution Control Act Amendments of 1972, 33 U.S.C. § 1323(a)?

3. Did Congress intend to permit a private cause of action to enforce § 13 and § 15 of the Rivers and Harbors Act of 1899, 33 U.S.C. §§ 407, 409?

4. Does the danger zone regulation promulgated by the Corps of Engineers, 33 C.F.R. § 204.234, unreasonably restrict the food fishing industry of Vieques contrary to 33 U.S.C. § 3?

5. Do the Navy's training activities generate such noise as to create a public nuisance in violation of Puerto Rico's criminal nuisance statute, P.R.Laws Ann. tit. 33, § 1365, and the requirements of § 4 of the Noise Control Act, 42 U.S.C. § 4903(a)?

6. Do the Navy's activities on Vieques violate the Endangered Species Act of 1973, 16 U.S.C. §§ 1531–1543?

7. Does the Navy's survey of historical sites on Vieques satisfy the requirements of § 106 of the National Historic Preservation Act, 16 U.S.C. § 470f, Executive Order 11593 and 36 C.F.R. § 800.4?

8. Should the Navy be enjoined from conducting training operations on Vieques?

After oral argument, we requested that the parties submit supplemental briefs on the question of whether any of the plaintiffs have a right of action to challenge the alleged violations of certain military authorization acts and executive branch directives related to training activities on Culebra and Vieques. With the benefit of briefs from both parties, we first address that question. [7]

*Right to Challenge the Alleged Transfer of Military Training Activities*

■ Puerto Rico alleged that the Navy "clandestinely" has transferred training operations from Culebra to Vieques, contrary to the "clear command" of the Military Construction Authorization Acts of 1971, 1972 and 1974. The district court rejected this contention, ruling that the statutes do

6. The Navy did not appeal the district court's order requiring the Navy to obtain a NPDES sewage discharge permit, prepare an environmental impact statement and obtain a determination on the eligibility of certain historical and prehistorical sites for inclusion in the National Register of Historic Places.

7. Because we understand the district court's decision on this question to include a determi-

nation that Puerto Rico had failed to state a claim upon which relief can be granted, we reject the Commonwealth's contention that the issue is not properly before us. The Navy raised this issue in its answer and the district court ruled, *inter alia*, that Puerto Rico had failed to establish the existence of a judicially enforceable mandate. 478 F.Supp. at 697–700.

not establish an enforceable mandate, and expressed serious doubt that a transfer of activities actually had occurred. On appeal, Puerto Rico argues that the trial court's narrow view of the acts ignores Congress' "carefully crafted" statutory "procedure" intended to protect the interests of the Commonwealth; Puerto Rico also challenges the court's finding that a transfer did not in fact occur. Our initial task is to ascertain whether Congress intended to permit the Commonwealth,[8] or any other party, to seek judicial enforcement of the three authorization acts. As with any question of statutory interpretation, we begin with an examination of the language of the statutes and the related executive branch directives. *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 16, 100 S.Ct. 242, 245, 62 L.Ed.2d 146 (1979); *Touche Ross & Co. v. Redington*, 442 U.S. 560, 568, 99 S.Ct. 2479, 2485, 61 L.Ed.2d 82 (1979).

In October 1970 Congress adopted the Military Construction Authorization Act of 1971, Pub.L.No.91–511, 84 Stat. 1204. Section 611(a) of the Act directed the Secretary of Defense "to prepare a report of the weapons training now being conducted in the Culebra complex . . . ." The Secretary was ordered to evaluate "all possible alternatives, geographical and technological," and make "recommendations for . . . moving all or part of such activities to a new site or sites," giving particular consideration to six factors:

(1) the safety and well-being of the people who live on Culebra;

(2) the natural and physical environment of Culebra and adjoining cays and their recreational value;

(3) the development of a sound, stable economy in Culebra;

(4) the unique political relationship of Culebra and Puerto Rico to the United States;

(5) the operational readiness and proficiency of the Atlantic Fleet; and

(6) national security.

Section 611(b) provided that the report was to be prepared in consultation "with the people of Culebra, the Government of Puerto Rico, and all appropriate federal agencies." Finally, the Navy was directed to "avoid any increase or expansion of the present weapons range activities in the Culebra complex and, wherever possible, without degrading the activities, to institute procedures which will minimize interference with the normal activities and the solitude of the people of Culebra."[9]

On April 1, 1971, Secretary of Defense Laird transmitted to Congress and the President the mandated report. In a press release issued the same day, the Secretary announced that he had ordered the Navy "to institute immediately a number of actions which will enhance the safety and well

---

8. Although the Commonwealth's standing as parens patriae in an action against the Navy may be questioned, *compare Commonwealth of Pennsylvania v. Kleppe*, 533 F.2d 668 (D.C.Cir. 1976) *with Washington Utilities & Transp. Comm'n v. F. C. C.*, 513 F.2d 1142 (9th Cir. 1975), we think the Commonwealth certainly has standing to raise this issue on the basis of the alleged injuries to its quasi-sovereign interest "in all the earth and air within its domain," an interest that is "independent of and behind the titles of its citizens . . . ." *Georgia v. Tennessee Copper Co.*, 206 U.S. 230, 237, 27 S.Ct. 618, 619, 51 L.Ed. 1038 (1907). *Cf. Massachusetts v. Mellon*, 262 U.S. 447, 482, 43 S.Ct. 597, 599, 67 L.Ed. 1078 (1923) (acknowledging the distinction between a state's quasi-sovereign interest in the environment and its status as parens patriae). *See also Missouri v. Holland*, 252 U.S. 416, 431, 40 S.Ct. 382, 382–383, 64 L.Ed. 641 (1920). Because we conclude that Puerto Rico has alleged "a 'distinct and palpa-

ble injury' . . . 'fairly traceable' . . . to the challenged conduct" of the Navy, *Duke Power Co. v. Carolina Env. Study Group*, 438 U.S. 59, 73, 98 S.Ct. 2620, 2630, 57 L.Ed.2d 595 (1978) (citations omitted), we need not decide whether the Mayor of Vieques or the Board on Environmental Quality have standing to litigate this case. *See Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 263–64, 97 S.Ct. 555, 562–563, 50 L.Ed.2d 450 (1977).

9. On January 11, 1971, the Navy entered into an agreement with the Government of Puerto Rico which imposed certain restrictions on the Culebra operations and also contained the Navy's assurance that it would "continue to investigate both technological and geographical alternatives to the training done around Culebra."

being of the residents of Culebra and reduce the irritants to them resulting from Navy training." The Secretary also expressed his intention to reappraise the situation by the end of 1972 and make a final decision about where to relocate the Culebra operations.

With the enactment in 1971 of § 207 of the Military Construction Authorization Act of 1972, Pub.L.No.92–145, 85 Stat. 394, Congress directed the Secretary of Defense to prepare a new study of "the most advantageous alternative [to the Culebra training complex] on the basis of investigations which consider cost, national security, the operational readiness and proficiency of the Atlantic Fleet, the impact on the environment, and other relevant factors." On December 27, 1972, Secretary Laird submitted his report and recommendations to the President and Congress. In an accompanying letter he identified Vieques as the best of the available alternative sites but concluded "that the Culebra complex offers such advantages over all other alternatives studied that none of these other alternatives can be considered reasonable." Relocation to Vieques "would significantly reduce the capability of the Inner Range and would transfer the training activity from an island with 700 inhabitants to one with 7,000 inhabitants," an "[im]prudent course of action." Thus, he recommended "that the Navy retain its training targets in the Culebra complex," yet "remain abreast of developments that would modify . . . the Navy's need" for the Culebra range.

In the following spring of 1973, Secretary Laird's successor, Elliot Richardson, informed the Secretary of the Navy that it was in the Defense Department's long-range interest to transfer the Culebra training activities to the islands of Desecheo and Monito by July 1, 1975. This relocation was to occur, however, only after Congress had appropriated the necessary funds and the Navy had achieved a "satisfactory overall arrangement with the government of Puerto Rico for carrying out the proposed move and for insuring the long-term continuation of the Atlantic Fleet Weapons Range and the Fleet Marine Force training area."

Congress responded to this change in the Defense Department's position with the enactment in 1973 of the Military Construction Authorization Act of 1974. Pub.L.No. 93–166, 87 Stat. 668. Section 204(a) of the Act authorized the appropriation of $12,000,000 to facilitate the relocation of the Culebra training operations. But § 204(b) "expressly conditioned [the relocation] upon the conclusion of a satisfactory agreement to be negotiated by the Secretary of the Navy . . . with the Commonwealth of Puerto Rico and reported to the Committees on Armed Services of the Senate and the House of Representatives prior to execution of such agreement." Congress directed that "the agreement shall provide, among other things, that the Commonwealth of Puerto Rico shall insure that (1) Commonwealth lands suitable for carrying out operations of the type referred to in subsection (a) will be made available for the long-term continued use of the Atlantic Fleet Weapons Range and Fleet Marine Forces training areas by the Navy, including, but not limited to, present areas and facilities on the island of Vieques . . . ."

Despite the absence of an agreement between the Navy and Puerto Rico, on June 22, 1974, Secretary of State Kissinger, acting as National Security Adviser, informed the Secretary of Defense of the president's decision to terminate the training activities on Culebra by July 1, 1975, and those on the Culebra Cays by December 31, 1975. Kissinger directed the Secretary of Defense "to consider and select alternative sites for the weapons range activities" and stated that "[t]he selection of the new site, if it is in Puerto Rico, will be contingent on its being acceptable to the Commonwealth . . . ." The Navy has ceased its operations on Culebra and negotiations continue over the selection of a new site.

When Congress has not expressly provided for private enforcement of a statute, there is little likelihood that the legislative history will disclose whether Congress nonetheless intended that result. *Cannon v. University of Chicago*, 441 U.S. 677, 694, 99

S.Ct. 1946, 1956, 60 L.Ed.2d 560 (1979). Thus, the statutory language becomes the best evidence of Congress' intent. As the Supreme Court recently recognized, in each of its earlier cases that did imply a private cause of action the statute in question either conferred a federal right on private parties or proscribed certain conduct. *Touche Ross & Co. v. Redington*, 442 U.S. at 569, 99 S.Ct. at 2485. Implicit in this observation is that the absence of statutory language that either prohibits some action or confers rights weighs heavily against implication of a private cause of action.

Neither the Military Construction Authorization Act of 1971 nor the 1972 Act creates rights or proscribes conduct of any relevance to this case. The 1971 Act's partial restriction of the Navy's activities in Culebra was unrelated to Navy operations on the other islands of the Commonwealth. In contrast, the 1974 Act made the relocation of the Navy's Culebra operations contingent on the execution of an agreement between the Navy and Puerto Rico. But even if we characterize this as a limited prohibition,[10] it appears from the language of the pertinent provision and the accompanying committee report that the condition was imposed to benefit the Navy rather than Puerto Rico. Section 204(b) required that the agreement contain assurances from the Commonwealth "that Commonwealth *lands suitable for carrying out operations* ... will be made available for the long *term continued use of the* ... *Navy*, including, but not limited to, present areas and facilities on the island of Vieques ...." Not only does this language impose an obligation on the Commonwealth rather than the Navy, but it forecloses negotiation over the training areas and facilities on Vieques. In the same vein, the joint conference report that accompanied the final draft of the Act states:

The restrictive language in Section 204 is a result of discussion with the Governor and others and the conferees believe it provides sufficient protection to the Navy upon relocation of ship-to-shore gunfire operations from Culebra to the other Islands mentioned.

H.R.Rep.No.634, 93d Cong., 1st Sess. 35 (1973). If Congress had intended to create a private right of action, it would have provided first for a right or duty upon which private enforcement could be based. But the authorization acts leave Puerto Rico without a place to hang its hat; the statutes grant no right to the Commonwealth, nor do they impose an obligation on the Navy for the benefit of the Commonwealth.

Puerto Rico argues that the authorization acts reflect Congress' intention to obligate the Navy to confer with other parties, particularly the Commonwealth, prior to any transfer of the Culebra operations. As part of that argument, Puerto Rico maintains that Congress anticipated that the agreement mandated by the 1974 Act would provide for "other things" beyond the Commonwealth's assurances of an adequate alternative site. The Commonwealth contends that this phrase undoubtedly was intended to encompass provisions for the protection of its environment and the welfare of its citizens; Congress impliedly sought to prevent a recurrence of the ecological and political problems created by the Navy's use of Culebra. Puerto Rico concludes that as the party most to be benefitted from this inferred congressional prohibition of unilateral Navy action, it must be granted a cause of action to vindicate Congress' intent.

Other than the phrase "among other things," however, Puerto Rico is unable to direct us to one provision in any of the three acts that establishes the mandate it

---

10. Congress' requirement of an agreement prior to relocation was effectively a prohibition only with respect to the expenditure of the $12,000,000. Without mention of the 1974 Act, President Nixon subsequently ordered the termination of the Culebra operations, ignoring the safeguards required by the Act. The Navy never expended the $12,000,000 appropriation and Congress eventually reallocated the amount to a Navy construction project in the Indian Ocean area. *See* Supplemental Appropriation and Recission Act, Pub.L.No.96–304, 94 Stat. 857 (July 8, 1980).

seeks to enforce. Instead, it relies primarily on the "necessary" inferences to be drawn from the statutes and the executive branch directives; Puerto Rico interprets the latter documents to corroborate its position. But the expansive inferences drawn by Puerto Rico, which we do not find to be free from doubt, must be contrasted with the limited nature of the legislation. The 1971 Act and the 1972 Act, as related to Vieques, directed the Secretary of Defense to prepare two feasibility reports; that is all. The 1974 Act did mandate execution of an agreement prior to relocation from Culebra. So far as the statute provides, however, we know only that Congress intended by this condition to protect the Navy's training capacity. Congress may have had a clear collective understanding of what "other things" were at issue, and the preferred resolution, but it chose not to reflect this in its 1974 legislation. Instead, it left to the parties the task of hashing out an agreement, subject to congressional, not judicial, review. The absence of any enforcement scheme in the authorization acts reinforces our conclusion that Congress intended that the controversy surrounding the Navy's training activities in Puerto Rico be resolved in the political sphere. Implication of a private cause of action would be contrary to the apparent intent of Congress, and, given the lack of a judicially enforceable mandate, a futile gesture.

Puerto Rico relies on the various executive branch directives principally to corroborate its interpretation of the authorization acts. As a second line of argument, however, it maintains that the directives have independent significance as sources of a private right of action. Unlike the situation presented by the three statutes, at least one of the directives contains a provision which ordered the Navy to obtain the Commonwealth's agreement prior to a relocation of the Culebra operations. In 1974 National Security Adviser Kissinger, on behalf of the President, directed the Secretary of Defense to end the Culebra operations and select a new site contingent on its being acceptable to the Commonwealth. Puerto Rico contends that this order imposed a legal obligation on the Navy that is enforceable by the Commonwealth. We conclude, however, that the President's order does not have the force and effect of law and thus is not enforceable by an implied private cause of action.

The Commonwealth attempts to cloak the 1974 presidential order with statutory authority, characterizing it as in furtherance of the 1974 Act. But in fact the order essentially ignored what we perceive to be the intent of Congress as evidenced in the Act. Rather than require the Commonwealth to insure alternative sites prior to a relocation of the Culebra operations, as Congress mandated, the President ordered termination of those operations without any prior assurances from Puerto Rico. Moreover, the order granted the Commonwealth a veto over the Navy's choice of an alternative site; nothing in the Act suggests that Congress intended such a role for the Commonwealth. When the President issued this order, he necessarily relied not on any statutory authority, but on his constitutional authority as the chief executive and the commander in chief of the armed forces. As such, the President has the power to direct the activities of the military but he is without the authority to legislate. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587–88, 72 S.Ct. 863, 867, 96 L.Ed. 1153 (1952). Without some basis in an act of Congress, the directive cannot constitutionally be invested with the status of law, *see Independent Meat Packers Ass'n v. Butz*, 526 F.2d 228, 234–36 (8th Cir. 1975), thus obviating a decision on the question of an implied cause of action.[11]

---

11. The other executive branch directives invoked by Puerto Rico do not require extensive comment. The statements of Secretary Laird, to the extent they pertain to Vieques, contain nothing more than certain recommendations based on the Department's evaluation of the island and the other potential relocation sites.

Secretary Richardson's memorandum to the Secretary of the Navy does not address the transfer of Culebra operations to Vieques. He ordered relocation to the uninhabited islands of Desecheo and Monito and required the Commonwealth's participation only with respect to the implementation of the plan and protection

The Commonwealth's reliance on section 10 of the Administrative Procedure Act as an alternative source for a cause of action founders upon the limitations inherent in the Act. Section 10(a) of the APA provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. But assuming that the Navy did "transfer" the Culebra activities to Vieques, that action is not "agency action."

Section 2 of the APA defines agency action to include "the whole or a part of an agency rule, order, license, sanction, relief or the equivalent or denial thereof, or failure to act . . . ." *Id.* § 551(13). Each of the types of action included within this definition is separately defined in § 2. *See id.* § 551(4), (6), (8), (10), (11). All but one of these specific definitions refer to one of two forms of regulatory activity—agency rulemaking or agency adjudication. "Sanction" is defined to include, in addition to regulatory activity, "any agency . . . destruction, taking, seizure or withholding of property." *Id.* § 551(10).

The Navy's transfer of military training activities did not remotely involve rulemaking or adjudication, nor, at least in this case, did it result in the "destruction, taking, seizure or withholding of property." We recognize that Congress intended the APA to span a "broad spectrum of administrative actions." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 140, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967). Nonetheless, the language of § 2 evidences that Congress intended to reach only actions that are ad-

ministrative, and we conclude that the challenged activities of the Navy do not fall within that spectrum. *But see Standard Oil Co. of Ca. v. F.T.C.*, 596 F.2d 1381, 1384–85 (9th Cir. 1979).

Even if we were to accept that the "transfer" constituted agency action, we would characterize it as action "committed to agency discretion by law," 5 U.S.C. § 701(a)(2), and thus unreviewable. This exception to § 10's broad entitlement to judicial review applies only "in those rare instances where 'statutes are drawn in such broad terms that in a given case there is no law to apply.' "[12] *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136 (1971), *quoting* S.Rep.No. 752, 79th Cong., 1st Sess. 26 (1945). *See Chrysler Corp. v. Brown*, 441 U.S. 281, 317, 99 S.Ct. 1705, 1725, 60 L.Ed.2d 208 (1979). The question before us presents one of those rare instances. The Commonwealth has cited as the applicable constraint on the Navy's training activities the Military Construction Authorization Acts of 1971, 1972 and 1974. But, as we have already explained in some detail, those statutes do not provide the judiciary with any "law to apply." [*]

We affirm the district court's ruling that with respect to the alleged transfer of military training activities from Culebra to Vieques, Puerto Rico has failed to state a claim upon which relief can be granted.

*Pollution of the Coastal Waters*

1. Puerto Rico Water Quality Standards

Section 313 of the Federal Water Pollution Control Act Amendments subjects ev-

---

of the Atlantic Fleet's interests. Moreover, Richardson's directive was essentially superseded by the President's 1974 order.

12. Because we conclude that the authorization acts are of no relevance to the Navy's authority to conduct the Vieques operations, we need not undertake the more detailed analysis set forth in *Hahn v. Gottlieb*, 430 F.2d 1243, 1249 (1st Cir. 1970), to determine the applicability of the "committed to agency discretion" exception of 5 U.S.C. § 701(a)(2). *Cf. Carter v. Colon*, 633 F.2d 964 at 966–967 (1st Cir. 1980) (recent application of the *Hahn* analysis).

* Our conclusion that the authorization acts do not impose a duty on the Navy to the benefit of the Commonwealth also undermines the Commonwealth's reliance on 28 U.S.C. § 1361. That statute grants the "district courts original jurisdiction of any action in the nature of mandamus to compel an officer . . . of the United States . . . to perform a duty owed to the plaintiff." *Id.* *See Falzarano v. United States*, 607 F.2d 506, 513 (1st Cir. 1979).

ery "department, agency, or instrumentality of the executive, legislative and judicial branches of the Federal Government" to "all Federal, State, interstate, and local requirements . . . respecting the control and abatement of water pollution in the same manner and to the same extent as any nongovernmental entity." 33 U.S.C. § 1323(a). Puerto Rico alleged that the Navy, by dropping ordinance into the waters of Vieques, has violated several water pollution control regulations promulgated pursuant to the Commonwealth's Water Pollution Control [13] and Public Policy Environmental Control Acts.[14] The district court rejected this allegation, finding no violation of the water quality standards it deemed applicable to the Navy's activity. 478 F.Supp. at 664–69. On appeal, Puerto Rico asserts that, contrary to the trial court's opinion, there are three germane water quality standards that the Navy has violated.[15] We consider each separately.[16]

Article 2.1.1 of the Puerto Rico Water Quality Standards [17] provides:

> The waters of Puerto Rico shall not contain materials attributable to discharges that will settle to form objectionable deposits. Nor will they contain floating debris, scum, oil and other floating materials attributable to discharges in amounts sufficient to be unsightly or deleterious.

Puerto Rico argues that the trial court erred in its interpretation of 2.1.1 by according determinative significance to the term "discharges," contrary to the purposes of the regulations and statute. We cannot agree. Article 2.1.1 expressly and exclusively addresses materials "attributable to discharges," which are defined as "[t]he outflow of wastewater from any . . . source

into receiving waters." Article 1. Turning to the definition of wastewater, we are directed to the definition of municipal wastes, which is "[w]ater carrying human and animal wastes from homes, buildings, industrial establishments and other places alone or in combination with industrial wastes." *Id.* No fair reading of this language warrants the conclusion that Article 2.1.1 applies to the bombing and shelling of coastal waters.

In contrast, the prohibitions annunciated in Article 2.1.3 are not limited in application to materials attributable to discharge. Article 2.1.3 directs that "[t]he waters of Puerto Rico shall not contain substances in concentrations or combinations which produce undesirable physiological responses in human, fish or other animal life, and plants." More specifically, subsection (A) establishes with respect to the coastal waters the "maximum allowable concentrations" of iron and certain other inorganic substances. Puerto Rico contends that the district court ignored the general prohibition of "substances . . . which produce undesirable physiological responses" and erred in its finding that the Navy's activity did not result in a violation of the maximum allowable concentration of iron.

The weakness in Puerto Rico's first contention is that it reads into Article 2.1.3 an unjustifiable breadth in scope. Article 2.1.3 speaks not simply of "substances," which, admittedly, could be construed to encompass solids such as spent ordinance as well as other refuse. Rather, the regulation addresses "concentrations" or "combinations" of substances. Those terms appear to refer in this context to the presence of chemicals and chemical processes rather than that of solids such as discarded ordnance. For ex-

---

13. P.R. Laws Ann. tit. 24, §§ 591–601.

14. P.R. Laws Ann. tit. 12, §§ 1121–1142.

15. Puerto Rico's reliance on the SB waters classification's prohibition of solids is misplaced. This prohibition of solids was part of the pre-1970 regulations, 24 P.R.R. & R. 598–5(a)(A) & (B), and has been superseded by Article 7.3 of the current Regulation, "Puerto Rico Water Quality Standards."

16. We undertake this examination of the water quality standards without the benefit of any prior judicial or administrative interpretation.

17. The "Puerto Rico Water Quality Standards" are designated as a single "Regulation." Each section of the Regulation is denoted an "Article." The Regulation is reprinted in Envir.Rep. —State Water Laws (BNA) 896:0301—: 0310.

ample, the "maximum allowable concentrations" established by 2.1.3 are expressed in terms of milligrams per liter, hardly a measurement appropriate to shell casings or bomb remnants. And those limitations are devoted to the specification of allowable concentrations of minerals and pesticides, not those of solids. We conclude that the apparent thrust of this regulation is the control and abatement of chemical pollution. We therefore agree with the district court that the sole issue under Article 2.1.3 is whether the Navy's used ammunition caused concentrations of iron in certain areas of the coastal waters to exceed the specified maximum allowable concentration.

■ With respect to this question, we find nothing in the record to contradict the trial court's finding. Although it appears fairly clear that the concentrations of iron in some areas near the target range do exceed the Article 2.1.3(A) standard, Puerto Rico failed to establish that ordnance dropped by the Navy caused these excessive concentrations of iron. Thus, the district court correctly found no violation of Article 2.1.3.

Finally, we turn to the broadly phrased prohibition of Article 4 of the Water Quality Standards. Article 4.1.1 provides that "[n]o person shall cause or permit the pollution of the waters of Puerto Rico ...." Pollution is defined in Article 1 as

> [a]ltering the natural characteristics of a body of water so as to make it in any way harmful or noxious to human health, or to that of animals, or plants, or rendering it ill-smelling or impure or altering adversely its physical, chemical, microbiological or radioactive condition, in such a way as to interfere with enjoyment of life or property or violate the standards of purity established by this Regulation.

Puerto Rico argues that the district court failed to apply Article 4.1.1 as a "generic" prohibition distinct from the specific standards set forth in Article 2. We conclude, however, that Article 4.1.1 does not consti-

tute a "standard" as referred to in Puerto Rico's Water Pollution Control Act.

The statutory prohibition of pollution makes it "unlawful for any person ... to throw, discharge, pour or dump ... into the waters ... any organic or inorganic matter capable of polluting" these waters "in such a manner as to place them out of the minimum standards of purity that the [Board on Environmental Quality] may establish ...." P.R.Laws Ann. tit. 24, § 595. Similarly, the statute defines pollution as "making [the waters] in any way noxious ... all according to the permissible standards of purity ... established as provided herein." P.R.Laws Ann. tit. 24, § 591(i). This language evidences the legislature's judgment that the general prohibition of pollution is not enough; standards explicating what pollution is must be provided. The statute anticipates administrative specification of its broad proscription in the form of standards by which particular actions may be evaluated. But Article 4.1.1 merely rephrases the general statutory command; it offers no clarification of that language, nor, unlike Article 2, does it provide any additional guidance to those who must conform to the law. To accept 4.1.1 as a "standard" would render meaningless the statutory requirement that the regulations promulgated thereunder further define and clarify the general statutory proscription of pollution. Because Article 4.1.1 is not a standard as contemplated by the authorizing statute, we decline to give it effect separate from the actual standards of the Regulation.[18]

We affirm the district court's conclusion that the Navy has not violated the applicable Puerto Rico Water Quality Standards or 33 U.S.C. § 1323(a).

### 2. The Rivers and Harbors Act of 1899

The second phase of Puerto Rico's attempt to halt the Navy's dropping of ordnance into the coastal waters of Vieques rests primarily on an alleged violation of Section 13 of the Rivers and Harbors Act of

---

**18.** The statutory provisions that empower the Board to adopt regulations, P.R.Laws Ann. tit. 12, § 1131(13) and tit. 24, §§ 598, 599, contain nothing contrary to this conclusion.

1899, 33 U.S.C. § 407. As a complement to that claim, Puerto Rico alleged that the Navy's sinking of the U.S.S. Killen in the Bahia Salinas del Sur violated Section 15 of the same act, 33 U.S.C. § 409. The district court ruled that neither § 13 nor § 15 give rise to a private cause of action for injunctive relief, 478 F.Supp. at 669–72. We affirm that decision with respect to § 13, but vacate the court's ruling with respect to § 15.

Section 13 makes it unlawful to throw, discharge or deposit "any refuse matter . . . into any navigable water of the United States . . ." without a permit from the Administrator of the Environmental Protection Agency. 33 U.S.C. §§ 407, 1342(a). The "comprehensive language" of this prohibition reflects a broad statutory purpose—the protection of navigation and the prevention of pollution. *United States v. Standard Oil Co.*, 384 U.S. 224, 228–30, 86 S.Ct. 1427, 1429–1430, 16 L.Ed.2d 492 (1966). *See United States v. Pennsylvania Industrial Chemical Corp.*, 411 U.S. 655, 93 S.Ct. 1804, 36 L.Ed.2d 567 (1973). Under § 17 of the Act, it is the duty of the Department of Justice to "conduct the legal proceedings necessary to enforce the provisions" of § 13.33 U.S.C. § 413. Although the Act expressly provides for criminal penalties only, *id.*, courts have recognized the federal government's implied authority to seek injunctive relief for a violation of § 13. *United States v. Stoeco Homes, Inc.*, 498 F.2d 597 (3d Cir. 1974), *cert. denied*, 420 U.S. 927,

95 S.Ct. 1124, 43 L.Ed.2d 397 (1975). *See Wyandotte Transp. Co. v. United States*, 389 U.S. 191, 88 S.Ct. 379, 19 L.Ed.2d 407 (1967); *Connecticut Action Now, Inc. v. Roberts Plating Co.*, 457 F.2d 81 (2d Cir. 1972). Puerto Rico argues that the broad purposes of § 13 also warrant the implication of a private cause of action for injunctive relief. We undertake an analysis of this claim mindful of the Supreme Court's recent adherence "to a stricter standard for the implication of private causes of action . . . ." [19] *Touche Ross & Co. v. Redington*, 442 U.S. 560, 578, 99 S.Ct. 2479, 2490, 61 L.Ed.2d 82 (1979).

■ The touchstone of this inquiry is whether Congress intended that the statute be enforced by private parties. *Transamerica Mortgage Advisers, Inc. v. Lewis*, 444 U.S. 11, 15, 100 S.Ct. 242, 245, 62 L.Ed.2d 146 (1979); *Touche Ross & Co. v. Redington*, 442 U.S. at 568, 99 S.Ct. at 2485. That intent usually can best be ascertained by addressing four factors. *See Cort v. Ash*, 422 U.S. 66, 78, 95 S.Ct. 2080, 2088, 45 L.Ed.2d 26 (1975). First, it must be determined from the statutory language "whether the statute was enacted for the benefit of a special class of which the plaintiff is a member." *Cannon v. University of Chicago*, 441 U.S. 677, 689, 99 S.Ct. 1946, 1953, 60 L.Ed.2d 560 (1979). The duties imposed by § 13 benefit the public at large; nothing in the statutory language identifies any special class as the principal intended benefi-

---

**19.** None of the courts of appeals that have previously considered this question were willing to imply a private cause of action under § 13. *See National Sea Clammers Ass'n v. City of New York*, 616 F.2d 1222 (3d Cir.), *cert. granted*, —— U.S. ——, 101 S.Ct. 314, 66 L.Ed.2d 145 (1980); *Sierra Club v. Andrus*, 610 F.2d 581 (9th Cir. 1979) (dictum); *cert. granted sub nom.; Kern County Water Agency v. Sierra Club*, —— U.S. ——, 101 S.Ct. 68, 66 L.Ed.2d 19 (1980); *City of Evansville, Inc. v. Kentucky Liquid Recycling, Inc.*, 604 F.2d 1008 (7th Cir. 1979); *Connecticut Action Now, Inc. v. Roberts Plating Co.*, 457 F.2d 81 (2d Cir. 1972) (*qui tam* action); *Guthrie v. Alabama By-Products Co.*, 456 F.2d 1294 (5th Cir. 1972) (per curiam), *cert. denied*, 410 U.S. 946, 93 S.Ct. 1352, 35 L.Ed.2d 613 (1973); *Bass Anglers Sportman's Society*

*of America, Inc. v. Koppers Co.*, 447 F.2d 1304 (5th Cir. 1971) (per curiam). *See also Parsell v. Shell Oil Co.*, 421 F.Supp. 1275 (D.Conn.1976), *aff'd mem. sub nom. East End Yacht Club, Inc. v. Shell Oil Co.*, 573 F.2d 1289 (2d Cir. 1977); *Lovaladies Property Owners Ass'n v. Raab*, 430 F.Supp. 276 (D.N.J.1975), *aff'd mem.* 547 F.2d 1162 (3d Cir. 1976), *cert. denied*, 432 U.S. 906, 97 S.Ct. 2949, 53 L.Ed.2d 1077 (1977). Although the district court thought that the Fourth circuit may have recognized a private cause of action in *Rucker v. Willis*, 484 F.2d 158 (4th Cir. 1973), *River v. Richmond Metropolitan Authority*, 481 F.2d 1280 (4th Cir. 1973), and *Lauritzen v. Chesapeake Bay Bridge and Tunnel District*, 404 F.2d 1001 (4th Cir. 1968), we do not find those decisions to support that conclusion.

ciary.[20] Rather, if there is a principal beneficiary of § 13's proscription, it is the "Government itself." *Wyandotte Transp. Co. v. United States*, 389 U.S. at 201, 88 S.Ct. at 385–386. With a statute such as § 13, one which creates "duties on the part of persons for the benefit of the public at large," the Supreme Court "has been especially reluctant to imply causes of actions." *Cannon v. University of Chicago*, 441 U.S. at 691–92 n.13, 99 S.Ct. at 1954–1955 n.13.

The second factor requires an investigation of the legislative history. As the Supreme Court has recognized, however, little is likely to be learned from the legislative history of a statute which is silent on the question of private enforcement. *Id.* at 694, 99 S.Ct. at 1956. The debates and reports preceding § 13's enactment at most evidence that Congress had no intent with respect to this question. *See Touche Ross & Co. v. Redington*, 442 U.S. at 571, 99 S.Ct. at 2486.

The third factor is whether it is "consistent with the underlying purposes of the legislative scheme to imply such a remedy ...."[21] 441 U.S. at 688–89 n.9, 99 S.Ct. at 1953 n.9. Section 17 of the Act provides that "[t]he Department of Justice shall conduct the legal proceedings necessary to enforce" § 13.33 U.S.C. § 413. The only role expressly created for private persons in the enforcement scheme is as informants; section 17 provides for the payment of one-half of a levied fine "to the person or persons giving information which shall lead to conviction." *Id.* § 411. In one respect, a private cause of action is clearly consistent with the legislative scheme. It would positively augment the government's enforcement efforts, thus better effectuating the ultimate objectives of § 13. But notwithstanding the remedial advantages to be gained from such implication, the language of these provisions establishes that Congress vested in the federal government the primary responsibility for enforcement.[22]

**20.** That the Commonwealth of Puerto Rico is one of the plaintiffs in this case does not alter our conclusion. Section 13 "no more evidences an intent to 'especially' benefit a class of [state governments] or their agents than a class of private parties ...." *City of Evansville, Ind. v. Kentucky Liquid Recycling, Inc.*, 604 F.2d 1008, 1012 n.7 (7th Cir.), *cert. denied*, 444 U.S. 1025, 100 S.Ct. 689, 62 L.Ed.2d 659 (1979).

**21.** Later in the *Cannon* opinion the court rephrased this factor as a question of whether "a private remedy ... would frustrate the underlying purpose of the legislative scheme" and observed that "when that remedy is necessary or at least helpful to the accomplishment of the statutory scheme, the Court is decidedly receptive to its implication ...." 441 U.S. at 703, 99 S.Ct. at 1961. To the extent that this rephrasing weighs more favorably towards implication of a private cause of action, we think it reflects the Court's previous conclusion that the statute at issue was intended to benefit a special class. The potential remedial advantages of an implied cause of action no longer hold the sway they once did, *Touche Ross & Co. v. Redington*, 442 U.S. at 578, 99 S.Ct. at 2490, even when the statute at issue does benefit a special class, *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. at 15–16, 19–20, 23–24, 100 S.Ct. 245, 247.

**22.** Puerto Rico puts great store in the fact that the Department of Justice is obligated to represent federal agencies charged with a violation of the Act and thus is "in no position to enforce the Act" against those same federal agencies. *Natural Resources Defense Council, Inc. v. Grant*, 355 F.Supp. 280, 290 (E.D.N.C.1973). The Commonwealth maintains that private parties must be allowed to vindicate the public's interest in environmental protection. *Id. See People of the State of Illinois ex rel Scott v. Hoffman*, 425 F.Supp. 71 (S.D.Ill.1977). *See also Sierra Club v. Andrus*, 610 F.2d 581, 590–91 (9th Cir. 1979), *cert. granted*, 487 F.Supp. 443 (1980). But whether or not this situation presents an insuperable conflict, our responsibility is to ascertain Congress' intent, not to improve upon its enforcement scheme. *Touche Ross & Co. v. Redington*, 442 U.S. at 578, 99 S.Ct. at 2490. Moreover, the absence of an implied private cause of action under § 13 does not mean that federal agencies are effectively free to ignore their responsibilities with respect to the control of water pollution. Section 313 of the Federal Water Pollution Control Act Amendments subjects every federal agency to "all Federal, State, interstate, and local requirements ... respecting the control and abatement of water pollution ...." 33 U.S.C. § 1323(a). Under § 505 of the same Act, *id.* § 1365, Puerto Rico may sue to enforce that obligation, as it has done in this case. The similarity in purpose between the Rivers and Harbors Act and the Federal Water Pollution Control Act is reflected in the fact that the permit requirement imposed by § 13 is now implemented by the Administrator of the EPA under § 402 of the Federal Water Pollution Control Act. *See* 33 U.S.C. § 1342(a)(1)(2).

To the extent that this decision involved factors other than the protection of navigation and the prevention of pollution, implication of a private cause of action could very well frustrate Congress' intent.[23] *See Connecticut Action Now, Inc. v. Roberts Plating Co.*, 457 F.2d at 89.

Finally, we must consider "whether implying a federal remedy is inappropriate because the subject matter involves an area basically of concern to the States." *Cannon v. University of Chicago*, 441 U.S. at 709, 99 S.Ct. at 1964. The federal interest in navigation and the control of pollution cannot be doubted. Congress' power under the Commerce clause gives that body virtually plenary authority over the navigable waters of the United States. *See, e. g., Gilman v. Philadelphia*, 70 U.S. (3 Wall.) 713, 18 L.Ed. 96 (1865); *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 6 L.Ed. 23 (1824). Since the enactment of the Rivers and Harbors Act in 1899, Congress has expanded federal efforts to control the pollution of navigable waters with the adoption of the Federal Water Pollution Control Act, as amended, 33 U.S.C. §§ 1251–1376. The enactment in 1969 of the National Environmental Policy Act, 42 U.S.C. §§ 4321–4347, underscores the federal commitment to combat pollution. We perceive no federalism-comity problems militating against the implication of a private cause of action under § 13.

Of the four factors we have analyzed to ascertain Congress' intent, only the last clearly favors implication of a private cause of action. Although we recognize that private enforcement of § 13 might be conducive to the protection of navigation and the control of pollution, "[t]he ultimate question is one of congressional intent, not one of whether this Court thinks that it can improve upon the statutory scheme . . . ." *Touche Ross & Co. v. Redington*, 442 U.S. at 578, 99 S.Ct. at 2490. What evidence there is does not warrant a conclusion that Congress intended to create a private cause of action under § 13.[24]

■ Section 15 of the Rivers and Harbors Act makes it unlawful "to voluntarily, or carelessly sink, or permit or cause to be sunk, vessels or other craft in navigable channels . . . ." 33 U.S.C. § 409. Puerto Rico maintains that the Navy's intentional sinking of a target ship, the U.S.S. Killen, in the Bahia Salinas del Sur, violated this prohibition. We conclude that Puerto Rico is without standing to assert this claim.

"The essence of the standing inquiry is whether" the plaintiff has alleged "a 'distinct and palpable injury' . . . 'fairly traceable' . . . to the challenged conduct." *Duke Power Co. v. Carolina Env. Study Group*, 438 U.S. 59, 73, 98 S.Ct. 2620, 2630, 57 L.Ed. 595 (1978) (citations omitted). Puerto Rico failed to allege that the sinking of the U.S.S. Killen resulted in any form of harm to the island or its inhabitants. Nor does the relief requested—an injunction against

Because no issue is presented here in which the substantive requirements of § 13 might differ from those of the Federal Water Pollution Control Act, we need express no view on the availability of a right of private enforcement against federal defendants in a situation in which they did.

**23.** Section 17 requires the Department of Justice "to vigorously prosecute all offenders . . . when requested to do so by the Secretary of the Army or by any of the officials hereinafter designated . . . ." 33 U.S.C. § 413. It vests in the appropriate administrative officials, if not also the Attorney General, the discretion to decide whether § 13 should be enforced in a particular case. As a provision for prosecutorial discretion, it reflects a legislative decision to husband the enforcement resources of the federal government, including those of the judiciary. The government's decision not to enforce

§ 13 against a particular party, perhaps in anticipation of an informal resolution of the matter, could be frustrated by a private party armed with an implied cause of action.

**24.** Two of the decisions relied upon by Puerto Rico rest, in principle if not by name, on an application of § 10(a) of the Administrative Procedure Act, 5 U.S.C. § 702. *See Citizens Committee for Hudson Valley v. Volpe*, 425 F.2d 97 (2d Cir.), *cert. denied*, 400 U.S. 949, 91 S.Ct. 237, 27 L.Ed.2d 256 (1970); *People of the State of Ill. ex rel Scott v. Hoffman*, 425 F.Supp. 71 (S.D.Ill.1977). That statute creates a right to judicial review for persons injured by "agency action," the definition of which does not encompass the Navy's dropping of ordnance into the coastal waters of Vieques. *See* 5 U.S.C. § 551(13). *See* p. 845, *supra*.

the Navy's training activities on Vieques—implicitly suggest the harm which Puerto Rico might have alleged. An injunction against current Navy activities hardly would remedy any injury to the environment or navigation caused by a sunken vessel. Removal of the ship would be the appropriate remedy for harm resulting from the ship's presence, but Puerto Rico did not request that relief.[25] The failure to allege a distinct and palpable injury renders Puerto Rico's claim under § 15 nonjusticiable. *See Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26, 39, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976); *Linda R.S. v. Richard D.*, 410 U.S. 614, 617, 93 S.Ct. 1146, 1148, 35 L.Ed.2d 536 (1973). Thus, we vacate the district court's decision with respect to this claim, and remand with instructions to dismiss for lack of jurisdiction.[26]

*Restrictions on Fishing*

"In the interest of the national defense, and for the better protection of life and property," section 1 of the Army Appropriation Act of 1918 authorizes the Secretary of the Army "to prescribe such regulations as he may deem best for the use and navigation of any portion or area of the navigable waters ... under the jurisdiction of the United States endangered or likely to be endangered by Artillery fire in target practice or otherwise ...." 33 U.S.C. § 3. The sole express restraint imposed by the statute on the Secretary's power provides "that the authority conferred shall be so exercised as not unreasonably to interfere with or restrict the food fishing industry ...." *Id.* Pursuant to this authority, the Secretary has promulgated danger zone regulations individually tailored to the particular area of water in question. *See* 33 C.F.R. § 204.

In 1974 the Secretary of the Army promulgated the following regulation:

Carribean Sea and Vieques Sound in vicinity of Eastern Vieques, bombing and gunnery target area.

(a) *The Danger Zone.* From Punta Conejo on the south coast of Vieques at latitude 18°06′30″, longitude 65°22′33″; thence to latitude 18°03′00″, longitude 65°21′00″; thence to latitude 18°03′00″, longitude 65°15′30″; thence to latitude 18°11′30″, longitude 65°14′30″; thence to latitude 18°12′00″, longitude 65°20′00″; and thence to Cabellos Colorados on the north coast of Vieques at latitude 18°09′49″, longitude 65°23′27″.

(b) *Regulations.* (1) It will be open to navigation at all times except when firing is being conducted. At such times no surface vessels, except those patrolling the area, shall enter or remain within the danger area. Prior to conducting each firing or dropping or ordnance the danger area will be patrolled to insure that no watercraft are within the danger area. Any watercraft in the vicinity will be warned that practice firing is about to take place and advised to vacate the area.

(2) The regulations will be enforced by the Commander, Caribbean Sea Frontier, San Juan, P.R., and such agencies as he may designate.

33 C.F.R. § 204.234 (1979).

At trial, Puerto Rico contended that the Navy's use of this area for bombing and gunnery practice unreasonably interfered with the island's food fishing industry, in violation of 33 U.S.C. § 3. In rejecting this claim, the district court ruled that:

The Plaintiffs herein have presented absolutely no evidence that Defendant Navy has impermissibly or unilaterally expanded the areas authorized as a danger zone (33 C.F.R. § 204.234) ... The navigable waters contiguous to Defendant Navy's weapons ′training range at Vieques are navigable waters of the

**25.** Puerto Rico correctly argues that a violation of § 15 can be established without proof that navigation has been actually obstructed by the voluntary sinking of a vessel. This does not, however, obviate the jurisdictional requirement that a private party seeking relief under § 15 allege some injury in fact to itself.

**26.** Given our disposition of this claim, we need not decide whether a private cause of action for injunctive relief should be implied from § 15. Nonetheless, we think it appropriate to observe that our analysis of that issue with respect to § 13 is equally applicable to § 15.

United States, and they have been restricted in exactly the manner intended by law and regulations.

478 F.Supp. at 701.

On appeal Puerto Rico argues that the district court failed to consider the needs of Vieques' fishing industry, in disregard of the statutory requirement that the danger zone regulation not unreasonably interfere with or restrict the food fishing industry. We conclude, however, that the only question properly before the court was whether the Navy had complied with the danger zone regulation.

As is apparent from the statutory language, the provision against unreasonable interference with the food fishing industry applies to the Secretary of the Army's exercise of his authority to prescribe and regulate. Assuming that the Navy has acted in accordance with 33 C.F.R. § 204.234, to decide whether the Navy has unreasonably interfered with fishing would necessarily draw into question the validity of the regulation under the enabling statute, 33 U.S.C. § 3. Yet Puerto Rico has not named the Secretary of the Army as a defendant in this case. Thus, if we, or the district court, were to define a standard of reasonableness for 33 U.S.C. § 3 and apply it to the facts of this case, we would do so in the absence of the agency responsible for the administra-

tive determination that 33 C.F.R. § 204.234 comports with the statutory command. None of the record relevant to the formulation of this regulation is part of the record in this case.[27] Nor, of course, has the Secretary had the opportunity, at trial or on appeal, to defend the propriety of the regulation.

Had the district court ruled on whether 33 C.F.R. § 204.234 unreasonably interferes with the food fishing industry, we would vacate that ruling for the reasons stated above.[28] We conclude, however, that the court's decision is only a determination that the Navy has complied with 33 C.F.R. § 204.234. We need offer no opinion on this because Puerto Rico has not challenged it on appeal.

*Noise Pollution*

■ In its complaint, Puerto Rico contended that the Navy's training activities generate "shock waves and excessive noise that unreasonably interfere with the health and welfare of residents of Vieques ...." It sought to enjoin these activities as a violation of the Commonwealth's criminal nuisance statute,[29] P.R.Laws Ann. tit. 33, § 1365,[30] alleged to be applicable to the Navy's operations through Section 4 of the Noise Control Act, 42 U.S.C. § 4903(b) (the Act).[31] The district court denied the re-

---

27. The current regulation, 36 C.F.R. § 204.234, was promulgated only after the Corps of Engineers had provided public notice of the proposed regulation and an opportunity for comments. 39 Fed.Reg. 13889, 27133 (1974).

28. When necessary to protect the interests of an absent party, a court of appeals should consider *sua sponte* whether a claim should be dismissed for failure to join an indispensable party. *See Provident Bank & Trust Co. v. Patterson*, 390 U.S. 102, 111, 88 S.Ct. 733, 738–739, 19 L.Ed.2d 936 (1968); *NLRB v. Doug Neal Management Co.*, 620 F.2d 1133, 1139 (6th Cir. 1980); *Kimball v. Florida*, 537 F.2d 1305, 1307 (5th Cir. 1976).

29. Although Puerto Rico does not seek to impose criminal penalties on the Navy, it chose to base its case on its criminal nuisance law rather than its very similar civil nuisance statute, P.R.Laws Ann tit. 32, § 2761, perhaps because the latter does not expressly refer to public nuisances. *See* note 40 *infra.* The choice of

statute relied upon does not affect our analysis or conclusion.

30. P.R.Laws Ann. tit. 33, § 1365 provides in pertinent part:

Anything which is injurious to health, or is indecent or offensive to the senses, or is an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property by an entire community or neighborhood, or by any considerable number of persons, or unlawfully obstructs the free passage or use, in the customary manner, of any navigable lake, river, bay, stream, canal or basin, or any public park, square, street or highway, is a public nuisance[.]

31. 42 U.S.C. § 4903(b) provides in pertinent part:

(b) Each department, agency, or instrumentality of the executive, legislative, and judicial branches of the Federal Government—

(1) having jurisdiction over any property or facility, or

quest for an injunction, ruling that the Act does not apply because the nuisance statute does not establish noise control "requirements" as that term is used in Section 4. 478 F.Supp. at 675. Despite this ruling, the court proceeded to consider the evidence and determined that the noise attributable to the Navy's activities does not interfere with the quality of life on Vieques. *Id.* at 680. We conclude that the district court was without jurisdiction to entertain Puerto Rico's claim.

A careful reading of the Noise Control Act's citizen suit provision, section 12, 42 U.S.C. § 4911, discloses that Congress expressly created a private cause of action only with respect to the enforcement of federal noise control requirements. Subsection (a) permits "any person," including a state, to bring suit in federal district court against any federal agency that has violated a "noise control requirement." That term is defined in subsection (f) by reference to other sections of the Act, all of which concern the granting of regulatory powers to the Administrator of the EPA or the Secretary of the Treasury, and the en-

forcement of regulations promulgated thereunder. Section 12 has no provision for citizens' suits to enforce a federal agency's duty to comply with state and local requirements regarding the control and abatement of environmental noise. Thus, Puerto Rico's claim, premised on a violation of state law, cannot be maintained under § 12 of the Act, 42 U.S.C. § 4911.

In the absence of an alternative basis in federal law, the unavailability of § 12 warrants dismissal of this state law claim for lack of jurisdiction because it is otherwise barred by sovereign immunity. *See United States v. Testan,* 424 U.S. 392, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976); *Larson v. Domestic & Foreign Commerce Corp.,* 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949). We recognize, however, that § 4, to the extent it subjects every federal agency to state noise control requirements, arguably permits suit against an officer of a federal agency for a violation of those requirements.[32] If § 4 requires the Navy to comply with Puerto Rico's criminal nuisance statute, this responsibility may be enforceable by an implied cause of action under § 4.[33] We reach

(2) engaged in any activity resulting, or which may result, in the emission of noise, shall comply with Federal, State, interstate and local requirements respecting control and abatement of environmental noise to the same extent that any person is subject to such requirements.

**32.** The doctrine of sovereign immunity bars suit against a federal agency *eo nomine* in the absence of an express congressional waiver. *See United States v. Testan,* 424 U.S. 392, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976); *United States v. King,* 395 U.S. 1, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969); *Commonwealth of Massachusetts v. United States Veterans Administration,* 541 F.2d 119 (1st Cir. 1976). In contrast, a federal officer is subject to suit despite the lack of express legislative waiver if that officer has acted outside the legal limitations on his authority. *Larson v. Domestic & Foreign Commerce Corp.,* 337 U.S. 682, 689, 69 S.Ct. 1457, 1461, 93 L.Ed. 1628 (1949). The federal mandate provided in 42 U.S.C. § 4903(b) constitutes such a limitation. *See Westinghouse Elec. Corp. v. Schlesinger,* 542 F.2d 1190, 1214 (4th Cir. 1976), *cert. denied,* 431 U.S. 924, 97 S.Ct. 2199, 53 L.Ed.2d 239 (1977).

**33.** A determination of whether Puerto Rico's nuisance statute constitutes a requirement un-

der § 4 will also determine whether the district court had subject matter jurisdiction over this claim. This question of jurisdiction should be resolved prior to a decision of whether Puerto Rico has stated a claim upon which relief can be granted. With respect to the latter issue, we observe only that implication of a cause of action is plausible. Although no court has previously decided whether § 12 exclusively defines the available causes of action under the Act, several courts of appeals have considered, and disagreed, about the implication of a cause of action in an analogous statutory context. Both the Clean Air Act and the Federal Water Pollution Control Act (FWPCA) contain citizen suit provisions quite similar to § 12. *See* 42 U.S.C. § 7604; 33 U.S.C. § 1365. The Courts of Appeals for the Second, Third and District of Columbia Circuits have held that 33 U.S.C. § 1365 does not preclude, *inter alia,* implication of a cause of action under different substantive provisions of the FWPCA. *National Sea Clammers Ass'n v. City of New York,* 616 F.2d 1222, 1228–31 (3d Cir.), *cert. granted,* —— U.S. ——, 101 S.Ct. 314, 66 L.Ed.2d 145 (1980); *Natural Resources Defense Council, Inc. v. Callaway,* 524 F.2d 79, 83–84 (2d Cir. 1975); *Natural Resources Defense Council, Inc. v. Train,* 510 F.2d 692, 698–703 (D.C.Cir.1974). The Seventh Circuit has rejected this conclusion with re-

the latter question, however, only if we first determine that Puerto Rico's nuisance statute establishes "requirements" that would trigger the application of § 4.

The key issue, therefore, is the definition of "requirements." As used in § 4 of the Noise Control Act, the term stands unexplicated by Congress or the courts. But the model from which § 4 was drawn,[34] section 118 of the Clean Air Act (currently codified at 42 U.S.C. § 7604), has received intense scrutiny. Judicial interpretation of the term "requirement" as used in § 118, and Congress' response to that interpretation, sheds considerable light on the definition of "requirements" as used in § 4.[35]

Section 118 of the Clean Air Act underwent its most important dissection at the hands of the Supreme Court in *Hancock v. Train*, 426 U.S. 163, 96 S.Ct. 2006, 48 L.Ed.2d 555 (1976).[36] Two steps in the Court's analysis are particularly apposite to the question before us. First, the Court's reading of § 118's legislative history disclosed that the various preliminary drafts and the committee reports used "require-

ments" interchangeably with "emission requirements" and "emission standards." *Id.* at 188–89 & n.2, 96 S.Ct. at 2017 & n.2. Congress apparently understood "requirements" to refer to standards specifying the permissible emission levels for various point sources and pollutants.[37] Though hardly conclusive, the court's observation presents some evidence of the legislative use of the term in the pollution control context, and particularly in the drafting of the prototype for § 4.

The second step in *Hancock* pertinent to our inquiry rested on the Court's recognition of the close relationship between § 118 and § 304, the citizen suit provision of the Clean Air Act. 42 U.S.C. § 7604. "§ 118 establishes the duty of federal installations to comply with state 'requirements,' and § 304 provides the means of enforcing that duty in federal court." 426 U.S. at 196, 96 S.Ct. at 2020. Section 304 restricts the area subject to enforcement by suit to emission limitations or standards, standards of performance, and compliance schedules. The Court concluded that the scope of the § 304

spect to the Clean Air Act. *City of Highland Park v. Train*, 519 F.2d 681, 690–93 (7th Cir. 1975), *cert. denied*, 424 U.S. 927, 96 S.Ct. 1141, 47 L.Ed.2d 337 (1976). In a case involving the FWPCA, this court expressly reserved decision of the question. *Commonwealth of Massachusetts v. United States Veterans Administration*, 541 F.2d 119, 122–23 & n.4 (1st Cir. 1976).

**34.** Although the legislative history of § 4 does not identify § 118 as the prototype for § 4, there is a close similarity in the language of the two provisions. And the legislative history does establish expressly the overall importance of the Clean Air Act as a model for the drafters of the Noise Control Act. *See* S.Rep.No.1160, 92d Cong., 2d Sess., *reprinted in* [1972] U.S. Code Cong. & Ad.News, 4655, 4658, 4661, 4667.

**35.** Section 313 of the Federal Water Pollution Control Act, 33 U.S.C. § 1323, also tracks the language of § 118 and has been similarly construed. *See Environmental Protection Agency v. California ex rel. State Water Resources Board*, 426 U.S. 200, 96 S.Ct. 2022, 48 L.Ed.2d 578 (1976).

**36.** Congress legislatively reversed the actual holding of *Hancock* with the enactment of the Clean Air Act Amendments of 1977, Pub.L.No. 95–95, 91 Stat. 685. *See* H.R. 6161, 95th Cong., 1st Sess. 12, *reprinted in* [1977] U.S.Code Cong. & Ad.News, 1077, 1089–90. Neither the

amendments nor the committee reports undermine that part of the Court's reasoning upon which we rely. The companion case to *Hancock, Environmental Protection Agency v. California ex rel. State Water Resources Board*, 426 U.S. 200, 96 S.Ct. 2022, 48 L.Ed.2d 578 (1976), suffered like treatment with the enactment of the Clean Water Act of 1977, Pub.L.No. 95–217, § 60, 91 Stat. 1597, 1598. *See* S.Rep.No. 370, 95th Cong., 1st Sess. 67, *reprinted in* [1977] U.S.Code Cong. & Ad.News, 4326, 4392. The apparent purpose of these amendments was to ensure the enforceability of the applicable substantive control requirements. We find no evidence that the amendments were intended to expand the category of applicable substantive requirements.

**37.** The Senate Committee report that accompanied the final draft of the Noise Control Act offers some evidence of a similar understanding with respect to the control of noise. *See.* S.Rep.No.1160, 92nd cong., 2d Sess., *reprinted in* [1972] U.S.Code Cong. & Ad.News, 4655. In particular, the Committee concluded that the federal noise control requirements that would be enforceable under § 12 should be "technologically-based standards" rather than the more open ended standard of the "public health and welfare." *Id.* at 4659.

enforcement power defined the scope of the § 118 duties because "it seems most unlikely that in providing that a State might bring suit in district court to enforce the duties of federal installations under § 118, the Congress would not make all those duties enforceable ...." *Id.* at 197, 96 S.Ct. at 2021.

We recognize a similar relationship between the "requirements" of § 4 and those of § 12 of the Noise Control Act. The primary objective in our attempt to clarify the term "requirements" is to ascertain Congress' intent and § 12 contains the sole legislative definition of that term in the Act. More importantly, that definition occurs in the provision for private enforcement of the Act. Section 12, unlike § 304 of the Clean Air Act, does not allow for suit by a state to enforce a state pollution control requirement. Thus, unlike the scheme of the Clean Air Act, § 12 does not define specifically which state requirements are incorporated in § 4. But it does permit a state to bring suit against a federal agency for violation of certain federal requirements. Considered together, the federal requirements enforceable under § 12 are the best evidence of the type of noise control requirement that Congress intended to be enforceable by suit against a federal agency.

Section 12 authorizes suit by a state to enforce "any noise control requirement," as defined in subsection (f). 42 U.S.C. § 4911(a). That definition in turn refers to several provisions of the Act which provide for (a) standards, rules or regulations controlling the noise emissions of motor carri-

ers, railroads and aircraft, *id.* §§ 4916, 4917; 49 U.S.C. § 1431, (b) labelling regulations, 42 U.S.C. § 4907, and (c) noise emission standards applicable to specified domestic and imported products, *id.* §§ 4905, 4908. From these various provisions of the Act we can abstract the type of legal control contemplated by the statutory term "requirement." The appointed agency establishes a standard that sets forth, specifically, the allowable intensity, duration and character of sounds[38] from a certain type of source, and then measures the noise emissions of such sources against that standard. *See* 40 C.F.R. Parts 201–205. This type of control relies on relatively precise standards capable of uniform application to similar sources of sound. We conclude that when Congress used the term "requirements" in the Noise Control Act, it was in reference to regulations of this type.[39]

The final question is whether Puerto Rico's criminal nuisance statute embodies the kind of "requirements" with which the Navy must comply pursuant to § 4. The statute broadly proscribes as a public nuisance:

> Anything which is injurious to health, or is indecent or offensive to the senses, or is an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property by an entire community or neighborhood, or by any considerable number of persons[.]

P.R.Laws Ann. tit. 33, § 1365. Although the criminal nuisance statute has not yet been subjected to judicial scrutiny, the Supreme Court of Puerto Rico has interpreted the similarly worded civil nuisance stat-

---

**38.** *See* 42 U.S.C. § 4902(11) (definition of environmental noise).

**39.** Puerto Rico relies on a statement in the Senate Committee's report that the Noise Control Act does not affect the authority of the states "to reach or maintain levels of environmental noise ... through [*inter alia*] nuisance laws." S.Rep. 1160, 92d Cong., 2d Sess., *reprinted in* U.S.Code Cong. & Ad.News 4660. But this statement is not part of the Committee's commentary on §§ 4 or 12. Rather, it addresses to what extent § 6 (42 U.S.C. § 4905),

and regulations promulgated thereunder, would preempt state law as applied to products in the hands of the user. *Id.* Section 6 authorizes the adoption of noise emission standards to be applied to products at the manufacturing stage. Establishing that state law is not preempted in this particular context does not answer the distinct question of to what extent Congress intended to waive the federal government's sovereign immunity. Neither § 6 nor the Committee's commentary on § 6 addresses this question.

ute.[40] It perceived as the essential purpose of that statute the maintenance of a balance between the defendant's right to the free use of his property and the rights of others to the comfortable enjoyment of life or property: To strike that balance requires a case by case determination of the reasonableness of a defendant's activity. *See Casiano Sales v. Lozada Torres*, 91 P.R.R. 473, 477–78, 482 (1964); *Arcelay v. Sanchez*, 77 P.R.R. 782, 790 (1955). This form of decisionmaking, peculiarly sensitive to the facts of a single case, permits no role for the type of specific, uniform standard characteristic of "requirements," as described above. Thus, we conclude that Puerto Rico's criminal nuisance statute falls outside § 4's incorporation of "State . . . requirements respecting control and abatement of environmental noise . . . ." 42 U.S.C. § 4903(b).

Our conclusion renders unnecessary a decision as to whether a private cause of action should be implied to enforce § 4's mandate. We see no other tenable ground upon which the district court had jurisdiction over the state nuisance claim. Therefore, we vacate the district court's decision and remand for dismissal for lack of jurisdiction.

*Endangered or Threatened Species*

■ Of the various animal species living in and around Vieques, four have been designated by the United States Fish and Wildlife Service as "endangered"[41] (of which three are in issue) and two others have been determined to be "threatened,"[42] in accordance with the criteria of § 4 of the Endangered Species Act (the Act), as amended, 16 U.S.C. § 1533. *See* 50 C.F.R.

§ 17.11. The Commonwealth alleged that the Navy's training operations directly imperil these species and cause significant adverse changes in their habitats, contrary to the requirements of § 7 of the Act, *id.* § 1536, and the prohibition of § 9, *id.* § 1538. The district court found that the Navy's activities do not adversely affect the five species and in fact inadvertently create a refuge for these species, protecting them from local hunters. On appeal, the Commonwealth challenges the court's findings and urges that the district court misconstrued the requirements of § 7(a). Because we conclude that the Navy has not fulfilled its obligations under § 7(a)(2), we vacate the district court's decision and remand for further consideration.

Section 4 of the Endangered Species Act directs the Secretary of the Interior and the Secretary of Commerce to determine which, if any, species are endangered or threatened, and to identify the critical habitat of the species so designated. 16 U.S.C. § 1533. As part of the Act's comprehensive design to protect such designated species, § 7(a)(2) provides:

> Each Federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [the critical] habitat of such species . . . .

*Id.* § 1536(a)(2).[43] Regulations promulgated jointly by the United States Fish and Wild-

---

**40.** P.R.Laws Ann. tit. 32, § 2761 states: "Anything which is injurious to health, or indecent, or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property, is a nuisance . . . ."

**41.** "The term 'endangered species' means any species which is in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6). The endangered species on Vieques include the brown pelican, the manatee, the leatherback turtle and the hawksbill turtle. 50 C.F.R. § 17.11. The effects of the Navy's activities on the manatee are not at issue in this appeal.

**42.** "The term 'threatened species' means any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. § 1532(20). The threatened species on Vieques include the loggerhead turtle and the green turtle. 50 C.F.R. § 17.11.

**43.** "Secretary," as used in § 7 and the other provisions of the Act, refers to the Secretary of Interior or the Secretary of Commerce, depending on the particular species at issue. Although these two officials formally share the responsibilities created by the Act, their duties are actually performed by two departmental

life Service and the National Marine Fisheries Service define the duty of a federal agency under § 7 to consult with those Services. 50 C.F.R. § 402.04. Every agency is required to review its programs and all other activities to determine whether any of its actions possibly affect endangered or threatened species or their habitats. *Id.* § 402.04(a)(1). Once an agency has discovered that some action for which it is responsible crosses the low threshold of possible effect, it must consult formally with the Fish and Wildlife Service or the Marine Fisheries Service. *Id.* § 402.04(a)(3). *See id.* § 402.01. Formal consultation requires that the agency request a "biological opinion" from the appropriate Service, and supplement the request with the available pertinent information. *Id.* In response, the Service issues a written statement that sets forth (1) its opinion on whether the agency is in violation of § 7(a)(2), (2) the information upon which it based its opinion, and (3) "recommendations for modifications in the identified activity program which would enhance the conservation and protection of a listed species or its critical habitat." *Id.* § 402.04(e)(4). *See* 16 U.S.C. § 1536(b).[44]

As of the date that the district court entered judgment, the Navy had failed to obtain a biological opinion with respect to the impact of its Vieques operations on the five listed species. By ignoring the statutory mandate, the Navy has sidestepped the administrative process that Congress expected would resolve many of the conflicts between agency action and the requirements of § 7.[45] If the Navy had sought consultation within a reasonable period following the adoption of the Act, the burden of litigating Puerto Rico's claim might have been avoided. The Navy's nonfeasance also has denied the district court potentially valuable evidence. In considering the 1979 amendments to the Act, Congress found, with approval, that courts have accorded substantial weight to a sound biological opinion in determining an agency's compliance with 7(a)(2).[46] Finally, biological opinions not only address possible violations of 7(a)(2), but more generally recommend conservation measures designed to mitigate or remove all adverse effects on an endangered or threatened species. These recommendations pertain to the statutory responsibility of agencies to carry out "programs for the conservation of endangered species or threatened species . . . ." 16 U.S.C. § 1536(a)(1).[47] Although the district court apparently found that the refuge effect created by the Navy's activities satisfied this obligation, *see* 478 F.Supp. at 689–90, a biological opinion could alter this conclusion.

agencies—the United States Fish and Wildlife Service (Interior) and the National Marine Fisheries Service (Commerce). For the remainder of this opinion, we refer to the Service rather than the Secretary.

**44.** Although the regulations, promulgated on January 4, 1978, made optional the offering of recommendations, Congress has since mandated inclusion of such recommendations in a biological opinion. Pub.L.No.95–632, 92 Stat. 3751 (1978). *See* H.Conf.Rep. 1804, 95th Cong., 2d Sess. 18, *reprinted in* [1978] U.S.Code Cong. & Ad.News, 9453, 9484, 9486; H.R.Rep. No.1625, 95th Cong., 2d Sess. 11–12, *reprinted in* [1978] U.S.Code Cong. & Ad.News, 9453, 9461–2.

**45.** *See* H.R.Rep.No.167, 96th Cong., 1st Sess. 5, *reprinted in* [1979] U.S.Code Cong. & Ad.News, 2561; H.Conf.Rep.No.1804, 95th Cong., 2d Sess. 18, *reprinted in* [1978] U.S.Code Cong. & Ad.News 9486; H.R.Rep.No.1625, 95th Cong., 2d Sess. 11, *reprinted in* [1978] U.S.Code Cong. & Ad.News 9461.

**46.** H.Conf.Rep.No.697, 96th Cong., 1st Sess. 12, *reprinted in* [1979] U.S.Code Cong. & Ad.News 2561. *Compare National Wildlife Federation v. Coleman*, 529 F.3d 359, 372–75 (5th Cir.) *cert. denied sub nom. Boteler v. National Wildlife Federation*, 429 U.S. 979, 97 S.Ct. 489, 50 L.Ed.2d 587 (1976) *with Sierra Club v. Froehlke*, 534 F.2d 1289, 1301–05 (8th Cir. 1976). *Cf. North Slope Borough v. Andrus*, 486 F.Supp. 332, 351–54 (D.D.C.), *vacated on other grounds sub nom. National Wildlife Federation v. Andrus*, No. 80–1148, et al. —— F.2d —— (D.C.Cir. Sept., 1980) (evaluation of a biological opinion in light of the statutory purposes).

**47.** The statute defines "conservation" to mean "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary." 16 U.S.C. § 1532(3).

858

Since entry of judgment, the Navy has received a biological opinion from the United States Fish and Wildlife Service. But that opinion is not part of the record and we therefore disregard it in our decision of this case. *See Construction Aggregates Corp. v. Rivera de Vicenty*, 573 F.2d 86, 95 n.7 (1st Cir. 1978); *Rosen v. Lawson-Hemphill, Inc.*, 549 F.2d 205, 206 (1st Cir. 1976). To do otherwise would be contrary to Federal Rule of Appellate Procedure 10(a) and would preclude the district court from considering evidence that both this court, and Congress, deem essential to a complete decision of the issue. Moreover, the Commonwealth should have the opportunity to challenge the adequacy of the biological opinion, both in terms of its factual basis and its recommendations.

The Commonwealth also challenges the Navy's training activities under § 9 of the Endangered Species Act, 16 U.S.C. § 1538. Section 9 prohibits any person, including an officer or department of the federal government, from taking an endangered species. *Id.* § 1538(a)(1)(B).[48] Taking is defined by the statute as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." *Id.* 1532(19). As interpreted by the Fish and Wildlife Service, harassment includes a significant disruption of normal behavioral patterns likely to cause injury, and harm includes significant disruption of essential behavioral patterns or environmental degradation. 50 C.F.R. § 17.3. So far as can be discovered from the briefs and the record, we understand Puerto Rico's claim under § 9 to rest on the proscription of harassment and harm as those terms are defined by the Fish and Wildlife Service. Because of the close similarity between this particular prohibition

and the requirements of § 7(a), we conclude that the § 9 claim should be remanded along with the § 7 claim. The district court should have the benefit of the biological opinion in determining whether the Navy's operations respect the proscription of § 9.

We vacate the district court's decision with respect to the Endangered Species Act and remand for further consideration in light of this opinion.

*Preservation of Historic and Prehistoric Sites*

■ Puerto Rico alleged in its complaint that the Navy's complete failure to identify and protect all the sites on Navy property that are of historical or archeological significance violated § 106 of the National Historic Preservation Act (16 U.S.C. § 470f), Executive Order 11593 and regulations issued by the Advisory Council on Historic Preservation.[49] After Puerto Rico had filed its complaint, the Navy undertook a combined sampling and predictive survey of the island which disclosed the existence of a number of sites on Navy property at least some of which may be eligible for inclusion in the National Register of Historic Places. The district court concluded that this survey satisfied the Navy's obligation to locate sites. 478 F.Supp. at 693. The court also ruled, however, that the Navy had violated the Executive Order by failing either to nominate to the Secretary of the Interior those newly discovered sites that may be eligible for listing in the Register or to seek the Secretary's opinion on their eligibility. *Id.* at 694. The court ordered the Navy to correct this omission and to safeguard the potentially eligible sites. *Id.* at 708.

On appeal, neither party challenges the district court's ruling with respect to determining the eligibility of known sites. But

48. Section 9 provides in pertinent part:
(a)(1) Except as provided in sections 1535(g)(2) and 1539 of this title, with respect to any endangered species of fish or wildlife listed pursuant to section 1533 of this title it is unlawful for any person subject to the jurisdiction of the United States to—
(B) take any such species within the United States or the territorial sea of the United States[.]

16 U.S.C. § 1538(a)(1)(B).

49. The Advisory Council on Historic Preservation is an independent agency, 16 U.S.C. § 470i, authorized to "promulgate such rules and regulations as it deems necessary to govern the implementation of section 470f ..." *Id.* § 470s.

the Commonwealth does question the court's decision on the adequacy of the Navy's survey. According to the Commonwealth, testimony by the Navy's own experts establishes that the survey did not locate all the sites on the island, as is required by the Act, the Executive Order, and the Advisory Council's regulations. We agree.

Section 106 of the National Historic Preservation Act, as amended, imposes a basic responsibility on "the head of any federal agency" to "take into account the effect" of a proposed federal undertaking "on any district, site, building, structure or object that is included in or eligible for inclusion in the National Register." 16 U.S.C. § 470f. With the promulgation of Executive Order 11593, the President substantially expanded the mandate of § 106. The order requires that every federal agency

(a) no later than July 1, 1973, with the advice of the Secretary of the Interior, and in cooperation with the liaison officer for historic preservation for the State or territory involved, locate, inventory and nominate to the Secretary of the Interior all sites, buildings, districts and objects under their jurisdiction or control that appear to qualify for listing on the National Register of Historic Places.

(b) exercise caution during the interim period until inventories and evaluations required by subsection (a) are completed to assure that any federally owned property that might qualify for nomination is not inadvertently transferred, sold, demolished or substantially altered.

36 Fed.Reg. 8921 (May 13, 1971), *reprinted in* 16 U.S.C. § 470 at 28. The express obligation imposed by the Executive Order

to locate "all" possibly eligible sites has been further defined within the past two years by the Advisory Council on Historic Preservation. *See* 36 C.F.R. § 800.4. The Council's regulations reaffirm "the responsibility of each Federal agency to identify or cause to be identified any National Register or eligible property ... that may be affected by the undertaking." *Id.* § 800.-4(a). Moreover, the regulations contemplate an active consultive role for the "State Historic Preservation Officer" from the inception of a federal agency's efforts to fulfill its historic preservation responsibilities. *See id.* § 800.4. Thus, the first step in satisfying an agency's obligations under the Executive Order and the regulations is to locate, in consultation with the state's officer for historic preservation, "all" and "any" sites that may be eligible for inclusion in the National Register.[50] The sole question is whether the Navy has satisfactorily completed that first step.

The Navy's survey of Vieques, which in design encompassed the entire island, relied on a combination of three methods. The island was divided into 665 squares, each of which measured 500 by 500 meters. Ten percent of the squares were selected randomly as samples. Another group of samples, approximately ten percent of the squares, were selected by randomly choosing one square and then selecting every tenth square after the first one chosen. The third method began with a search by the Navy's archeologist of the available literature and interviews with local residents having special knowledge of the island's history. On the basis of this inquiry, and his prior experience, he directed the survey team to the squares that he predicted were

---

50. Although by its terms § 106 applies only to proposed undertakings, the Navy does not challenge the validity of Executive Order 11593 or the Council's regulations as applied to current undertakings. There is good reason for their acquiescence. Executive Order 11593 expressly derives its statutory authority not only from the National Historic Preservation Act but also, *inter alia*, the National Environmental Policy Act, 42 U.S.C. §§ 4321 et seq. Although NEPA refers only to proposed major federal actions, it has been construed to apply to ongoing federal

activities. *Jones v. Lynn*, 477 F.2d 885, 889 (1st Cir. 1973); *Environmental Defense Fund v. TVA*, 468 F.2d 1164, 1176–81 (6th Cir. 1972); *see TVA v. Hill*, 437 U.S. 153, 188 n.34, 98 S.Ct. 2279, 2299 n.34, 57 L.Ed.2d 117 (1978). More generally, the reasoning underlying this construction of NEPA supports a similar conclusion with respect to the scope of § 106 of the National Historic Preservation Act. *See Jones v. Lynn*, 477 F.2d at 889; *Environmental Defense Fund v. TVA*, 468 F.2d at 1176–81.

most likely to contain archeological remains. The squares that were selected by these three methods were then walked by members of the survey team at intervals of 100 meters. Each square was traversed in a criss-cross fashion, the surveyor walking several times along the line of each 100 meter point from east to west and then from north to south.

The Navy defends its survey as a responsible and reasonable good faith effort to locate the archeological sites that still exist on Vieques. According to the Navy, when it had completed the survey it had satisfied the duty imposed by the Executive order and the regulations to locate all sites that may be eligible for inclusion in the National Register. But the testimony of the archeologist responsible for the design of the Navy's survey belies this contention. He testified that there remain to be located a substantial number of sites of possible archeological value. Thus, he characterized the survey as preliminary and acknowledged the need for additional work. Given the likelihood of further discoveries, the Navy's position flies in the face of the requirement that it locate "*all* sites that appear to qualify for listing on the National Register of Historic Places." Executive Order No. 11593, 36 F.R. 8921, *reprinted in* 16 U.S.C. § 470 at 28. (emphasis added). We assume without deciding that the survey methods adequately identified the likely locations of eligible sites. We cannot condone, however, the Navy's failure to gather in all the fruits of its survey.

Far from suggesting that the Navy must perform the impossible, we conclude only that it must follow up on the leads produced by the survey it commissioned.[51] Our conclusion does not require the Navy to undertake a 100% survey of Vieques. The current survey not only disclosed the probable existence of other sites but also established the archeological sterility of certain areas of the island; further efforts in those areas would be fruitless. It is not possible to ascertain from the present record which areas do require more investigation. Once the survey results are clarified, the district court, with the aid of the parties, should be able to define with fair precision what additional action is required of the Navy. We assume that any proposal made by the Navy to complete its obligation to locate all sites will be formulated in consultation with the Commonwealth officer responsible for historic preservation, as mandated by Executive Order 11593 and 36 C.F.R. § 800.4. Finally, although our decision pertains solely to the Navy's survey efforts, the district court is not foreclosed from considering on remand whether the Navy has taken sufficient measures to safeguard any sites which have been or are likely to be located and may be eligible for inclusion in the National Register.[52]

We vacate the district court's decision on the adequacy of the Navy's efforts to locate all sites of historical or archeological value, and remand for further consideration in light of this opinion.

51. We agree with the Commonwealth that the Navy would be well advised to emulate the cooperation shown by the Pacific Fleet in the survey of the Hawaiian island of Kahoolawe. *See Aluli v. Brown*, 437 F.Supp. 602 (D.Hawaii 1977), *rev'd in part on other grounds*, 602 F.2d 876 (9th Cir. 1979). This does not mean, however, that an exact replication of the Kahoolawe survey, which will ultimately cover 100% of the surface area of the island, is required of the Navy with respect to Vieques. Unlike Kahoolawe, it appears very unlikely that the entire island of Vieques would be eligible as a single district for inclusion in the National Register. *See Aluli v. Brown*, 437 F.Supp. at 610. What impresses us about the Kahoolawe survey is the extensive cooperation between the

Navy and state· officials and the good faith effort to locate all potentially eligible sites.

52. The Navy urges that the pending Memorandum of Agreement between it and the Advisory Council obviates any further judicial scrutiny of its efforts to comply with the Executive Order and the regulations. But such agreements relate to the mitigation of adverse effects on sites that already have been located. *See* 36 C.F.R. § 800.6(b), (c). The pending agreement would be complete only after the Navy has fulfilled its obligation to locate all eligible sites. If an agreement has been executed, we expect that the district court would consider it in evaluating the adequacy of the Navy's efforts to protect the eligible sites.

*The Remedy*

We turn finally to a review of the district court's remedial order with respect to three rulings. The court held as follows:

(1) That Defendant Navy is in violation of the Federal Water Pollution Control Act, *supra*, by reason of its lack of a NPDES permit to cover the occasional release or firing of ordnance into the waters of Vieques,

(2) That Defendant Navy is in violation of Executive Order 11593, *supra*, by reason of its failure to nominate to the Secretary of the Interior various sites in Vieques that may be eligible for listing in the National Register of Historic Places, and/or by its failure to seek the opinion of the Secretary respecting said eligibility, and

(3) That Defendant Navy is in violation of the National Environmental Policy Act, *supra*, by its failure to file an environmental impact statement in connection with its activities in and around Vieques.

478 F.Supp. at 705. The court ordered the Navy to take the necessary steps to achieve compliance, but refused to enjoin the Navy from continuing its training operations. *Id.* at 708. The Commonwealth challenges the court's denial of its request for a prohibitory injunction as mistakenly based on a balancing of equities. According to the Commonwealth, having found the Navy in violation of the NEPA, the FWPCA, and the Executive Order, the court had no choice but to halt the Navy's operations until the violations were cured. We consider this challenge as directed to each of the three rulings.

1. The NPDES Permit Requirement

■ With respect to the violation of the Federal Water Pollution Control Act, we conclude that the district court erred in undertaking a traditional balancing of the parties' competing interests. In *TVA v. Hill*, the Supreme Court refused "to strike a balance of equities" where "Congress, exercising its delegated powers, has decided the order of priorities in a certain area ....'" 437 U.S. 153, 194, 98 S.Ct. 2279, 2301–2302, 57 L.Ed.2d 117 (1978); *see also United States v. City and County of San Francisco*, 310 U.S. 16, 30–31, 60 S.Ct. 749, 756–757, 84 L.Ed. 1050 (1940). Like the statutory mandate at issue in *Hill*, the NPDES permit requirement of the Federal Water Pollution Control Act embodies a congressional ordering of priorities. Congress has prohibited "the discharge of any pollutant," 33 U.S.C. § 1311(a), which includes the Navy's dropping of ordnance into the coastal waters, unless a NPDES permit has been secured pursuant to 33 U.S.C. § 1342. Whether or not the Navy's activities in fact harm the coastal waters, it has an absolute statutory obligation to stop any discharges of pollutants until the permit procedure has been followed and the Administrator of the Environmental Protection Agency, upon review of the evidence, has granted a permit. Thus, regardless of the district court's finding that the Navy's dropping of ordnance caused no significant harm to the environment, it erred in failing to consider the judiciary's "responsibility to protect the integrity of the ... process mandated by Congress ...." *Jones v. Lynn*, 477 F.2d 885, 892 (1st Cir. 1973); *see Realty Income Trust v. Eckerd*, 564 F.2d 447, 456–57 (D.C. Cir.1977).[53] Although on this record the district court did not clearly err in its finding, the permit process "might reveal substantial environmental consequences," *City of New York v. United States*, 337 F.Supp. 150, 160 (E.D.N.Y.1972), *quoted in Realty Income Trust v. Eckerd*, 564 F.2d at 456, that would lead the Administrator to deny the application or grant only a limited permit. Unlike the situation presented in *Essex County Preservation Ass'n v. Campbell*, 536 F.2d 956, 960–61 (1st Cir. 1976), where the statutory violation was deemed "technical," here the Navy has utterly disregarded

---

**53.** Although *Jones* and *Eckerd* involved the procedural requirements of the National Environmental Policy Act, we think this responsibility holds as true with respect to the NPDES permit process. *See Save Our Sound Fisheries Ass'n v. Callaway*, 387 F.Supp. 292, 299–300 (D.R.I.1974).

the statutory mandate.[54] Thus, we vacate the district court's order on this question and remand with instructions to order the Navy to take all steps necessary to insure that no ordnance is discharged into the coastal waters of Vieques until such time as it obtains a NPDES permit.[55] If this order significantly interferes with the Navy's preparedness, it is free to request the President to exempt it from the NPDES requirements in the interest of national security. *See* 33 U.S.C. § 1323(a).

2. Executive Order 11593

The Commonwealth offers no reason for us to alter the district court's order insofar as it requires the Navy to protect all sites that may be eligible for inclusion in the National Register of Historic Places. Given the district court's finding that the Navy's operations do not presently threaten the known sites, which is not clearly in error, it was not an abuse of the court's discretion to impose a limited order rather than a wholesale proscription of the Navy's operations. Although, as already discussed, we have decided that the Navy has yet to satisfy its duty under Executive Order 11593, nothing in the present record suggests that the training activities as a whole endanger the additional sites likely to be located. It is open to the district court on remand to modify its order in light of further discoveries or evidence that the Navy has failed to safeguard the potentially eligible sites.

3. The Environmental Impact Statement

Since entry of the district court's judgment, the Navy has prepared a final environmental impact statement (EIS), as required by the court's order and 42 U.S.C. § 4332(2)(C). As a result, we conclude that the issue of whether the training operations should be halted for failure to prepare and file an EIS is moot. Although neither par-

ty raised this question, this court has a responsibility to consider *sua sponte* whether an issue on appeal has been rendered moot by subsequent events. *See North Carolina v. Rice*, 404 U.S. 244, 245, 92 S.Ct. 402, 403–404, 30 L.Ed.2d 413 (1971). At oral argument, counsel for the Navy informed us that a final EIS had been prepared and we assume that it has been filed in accordance with 42 U.S.C. § 4332(2)(C). *See DeFunis v. Odegaard*, 416 U.S. 312, 317, 94 S.Ct. 1704, 1706, 40 L.Ed.2d 164 (1974). Nothing would be gained by enjoining the Navy's operations for failure to do that which it has done. *See id.* at 316. Nor is there a " 'reasonable expectation that the wrong will be repeated.' " *United States v. W. T. Grant Co.*, 345 U.S. 629, 632, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953), *quoted in County of Los Angeles v. Davis*, 440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642 (1979). Because our conclusion pertains only to the preparation and filing of an EIS, it does not foreclose the Commonwealth from challenging the adequacy of the EIS or the Navy's response to the EIS findings. *See Crowell v. Mader*, 444 U.S. 505, 506, 100 S.Ct. 992, 992, 62 L.Ed.2d 701 (1979). We therefore vacate the order of the district court requiring the Navy to prepare and file an environmental impact statement and remand with instructions to dismiss the claim as moot.

*Summary*

We affirm the district court's findings and rulings, as modified by our opinion, except as follows:

(a) the decision with respect to § 15 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 409, is vacated and remanded for dismissal of the claim for lack of jurisdiction;

(b) the decision with respect to § 4 of the Noise Control Act, 42 U.S.C. § 4903(a), and Puerto Rico's criminal nui-

---

**54.** Unlike the environmental impact statement requirement of the NEPA, 33 U.S.C. § 1311(a) is not satisfied by the filing of any application; only the granting of a NPDES permit releases a party from that provision's prohibition. Thus, our conclusion is not altered by the fact that the Navy has now applied for a permit.

**55.** Insofar as most, if not all, of the Navy's targets are land based, we doubt that this order will significantly impair the Navy's military preparedness.

sance statute, P.R.Laws Ann. tit. 33, § 1365, is vacated and remanded for dismissal of the claim for lack of jurisdiction;

(c) the findings and ruling with respect to § 7(a) and § 9 of the Endangered Species Act, 16 U.S.C. §§ 1536(a), 1538, are vacated and remanded for further consideration;

(d) the ruling with respect to Executive Order 11593 and 36 C.F.R. § 800.4 is vacated and remanded for further consideration;

(e) the order with respect to the NPDES permit requirement is vacated and remanded with instructions for further proceedings in accordance with this opinion;

(f) the order with respect to the preparation and filing of an environmental impact statement pursuant to 42 U.S.C. § 4332(2)(C) is vacated and remanded with directions to dismiss.

*Affirmed in part, vacated in part and remanded in part.*